FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 1 of 50

INDEX NO. 720074/2019
RECEIVED NYSCEF: /08/2020

# STATE OF NEW YORK.

No. 14.

# IN ASSEMBLY,

JANUARY 26, 1891.

## FIFTH ANNUAL REPORT

OF THE

# FACTORY INSPECTORS.

STATE OF NEW YORK:

OFFICE OF FACTORY INSPECTORS, }
ALBANY, *January* 26, 1891.        }

*To the Legislature of the State of New York:*

In accordance with the provisions of chapter 409 of the Laws of 1886, as amended, herewith is respectfully submitted to your honorable body the Fifth Annual Report of the Factory Inspectors.

Very truly yours.

**JAMES CONNOLLY,**

*Factory Inspector.*

JOHN FRANEY,

*Assistant Factory Inspector.*

INDEX NO. 720074/2019
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 2 of 50
RECEIVED NYSCEF: 09/08/2020

recom-
ilers be
l boilers
men of
n power
m to be

,.

boilers,
having
he best
e of an
r might
be less
require
esire to
appli-
ejected
of this
esume
boilers
utside
their
ngines
roper-
nowl-
valve.
it the
ion of
s and
below
mber

caped
everal
ber of
n the

river bank in Second avenue, directly west of the Rensselaer House
and adjoining the Rensselaer House stables.

About 10:30 last night a man passing the tannery was attracted to
the building by a rumbling sound in the machinery. As no one was
about the building he hastened to the Rensselaer House, where most
of the employés of the tannery board, and awakened Henry Shultz,
one of the employés, and together the two ran back to the tannery
building, and Mr. Shultz, as soon as he opened the tannery door,
comprehended that the boiler was in danger of blowing up. Crawling
to it he found there was a pressure of 115 pounds of steam and that
the gauge showed a very small amount of water in the boiler.

Shultz had only an instant to act, and at the risk of his life climbed
to the top of the boiler, and knocking open a valve allowed the steam
to escape. If a few minutes more had passed before this was done,
the tannery might have been blown to atoms, and the Rensselaer
House, full of guests, wrecked. A few days ago the regular engineer
of the tannery, Augustus Hopman, left, and Mr. Shultz explained this
morning that *the narrow escape of the engine was due to a new engineer*
WHO DID NOT UNDERSTAND ABOUT THE BOILER.

Of course an examination of steam boilers and a test
of the qualifications of engineers will not prevent boiler
explosions, but that the number of them will be reduced is
certain. Before the United States instituted its rigid exami-
nation of marine engineers, and all boilers on steam vessels,
it was a comparatively common thing to read about steam-
boats blowing up. In these days such disasters very seldom
happen. I think a similar policy with regard to stationary
engineers and boilers would have a like good result.

## WEEKLY PAYMENT OF WAGES.

The time of the department has been taken up to a con-
siderable extent, since July first, in enforcing the following
statute:

AN ACT to provide for the weekly payment of wages by
corporations.

APPROVED by the Governor, May 21, 1890. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly,
do enact as follows:*

SECTION 1. Every manufacturing, mining or quarrying, lumbering,
mercantile, railroad, surface, street, electric and elevated railway

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 3 of 50

(except steam surface railroads), steamboat, telegraph, telephone and municipal corporation, and every incorporated express company and water company shall pay weekly, each and every employe engaged in its business, the wages earned by such employe to within six days of the date of such payment, provided, however, that if at any time of payment any employe shall be absent from his regular place of labor, he shall be entitled to said payment at any time thereafter upon demand.

§ 2. Any corporation violating any of the provisions of this act shall be liable to a penalty not exceeding fifty dollars and not less than ten dollars for each violation, to be paid to the people of the State and which may be recovered in a civil action; provided an action for such violation is commenced within thirty days from the date thereof. The Factory Inspectors of this State, their Assistants or Deputies may bring an action in the name of the people of the State as plaintiff against any corporation which neglects to comply with the provisions of this act for a period of two weeks, after having been notified in writing by such Inspectors, Assistants or Deputies, that such action will be brought. On the trial of such action, such corporation shall not be allowed to set up any defense for a failure to pay weekly any employe engaged in its business the wages earned by such employe to within six days of the date of such payment other than a valid assignment of such wages or a valid set-off against the same, or the absence of such employe from his regular place of labor at the time of payment, or an actual tender to such employe at the time of payment of the wages so earned by him, or a breach of contract by such employe, or a denial of the employment. No assignment of future wages, payable weekly, under the provisions of this act shall be valid if made to the corporation from whom such wages are to become due, or to any person on behalf of such corporation, or if made or procured to be made to any person for the purpose of relieving such corporation from the obligation to pay weekly under the provisions of this act. Nor shall any of said corporations require any agreement from any employe to accept wages at other periods than as provided in section one of this act as a condition of employment.

§ 3. The provisions of section two hundred and sixty-three, and three hundred and eighty-four of the Code of Civil Procedure shall apply to and govern any proceedings brought to enforce the provisions of this act, and it is hereby made the duty of the Attorney-General of this State to appear in behalf of such proceedings brought hereunder by the Factory Inspectors of this State, their Assistants or Deputies.

§ 4. This act shall take effect on the first day of July, eighteen hundred and ninety. [*Chapter 388, Laws of* 1890.]

To carry out the provisions of this act the following forms were prepared for distribution:

### CIRCULAR TO CORPORATIONS.

OFFICE OF FACTORY INSPECTOR, }
ALBANY, *June*, 1890. }

#### WEEKLY PAYMENT OF WAGES.

*To whom it may concern:*

The Factory Inspectors are required to enforce the provisions of Chapter 388 of the Laws of 1890, the full text of which is printed below, for the purpose of acquainting you with the provisions of this new statute. In order to facilitate the work of this department, kindly fill out and return the accompanying blank, and oblige

Yours respectfully,

**JAMES CONNOLLY,**

*Factory Inspector.*

[ Here followed a copy of the law.]

### BLANK FOR MUNICIPAL RETURN.

OFFICE OF FACTORY INSPECTOR, }
ALBANY, *June*, 1890. }

*To the* ........................

*of* ........................

........................ *county, N. Y.:*

DEAR SIR.— Chapter 388, Laws of 1890, requiring the payment of wages weekly, applies to municipal corporations, and the provisions thereof must be enforced by the Factory Inspectors of the State. In the capacity of executive officer of your municipality, will you kindly fill out the blank below (or refer it to the proper officer) and return the same at your earliest convenience to

Yours respectfully,

**JAMES CONNOLLY,**

*Factory Inspector.*

Town, city, or village of ........................

County of ........................

Name of mayor, or president ........................

Average number of persons on pay-roll: ........... men;

................ women.

100          Fifth Annual Report of the

Of whom about ....... were paid daily; about ........ weekly;
[Please state number.]
about ........ monthly; and about ........ by the piece or job.

What steps have been taken (if any are necessary) to comply with
the provisions of the " Weekly Payment law ?" ................ ...

If nothing has yet been done in that direction, please state, if
possible, what is the prospect of a compliance with the law on the
part of your municipality, and how soon after July 1, 1890, will it be
complied with ? ...............................................

Remarks: ....................... ............................

Will you kindly forward a copy of any opinion rendered by the
legal adviser of your municipality on this subject?

                    Signature ...........................
                    Official position .....................
Dated ............, 189..

                    ——

          BLANK FOR CORPORATION RETURN.

                    Office of Factory Inspector, ⎫
                         Albany, June, 1890.   ⎬

To the executive officers of all corporations :

Gentlemen.— In view of the provisions of Chapter 388 of the Laws
of 1890 (a copy of which is herewith inclosed), the undersigned will
consider it a favor if this blank is filled out and returned at your
earliest convenience.

                    Respectfully yours,
                    JAMES CONNOLLY,
                         Factory Inspector.

Name of corporation ........................................

                    OFFICERS.

....................President.       ..................... ⎫
....................Vice-President.  ..................... │
......... ...Supt. or Manager.       ..................... ⎬ Board of Directors.
                                     ..................... │
                                     ..................... ⎭

The general office is at No.............street, city of............
State of............. Our works are at No................ street,
city of............. .....State of...................
We are engaged in the business of............................
We employ on an average.............hands; about.............
[Here state number.]                          [Here state number, if any.]

of whom are females.  Of the males about................work on
the piece system; about.................work on the day system;
about...............work by the week; and about...............
work by the month.  Of the females, about...............work on
the piece system; about.................work on the day system;
about...............work by the week; and about...............
work by the month.

Heretofore (previous to July 1, 1890) our employés were paid
...................... [State whether weekly, monthly, etc.]

In cash, store orders, or otherwise?...........................

How much time was held back at each pay day?................

Have you changed your system of paying wages since the enact-
ment of the "Weekly Payment law?" .............................

Do you propose to change it, and, if so, please state on what date this
change will go into effect?......................  ....  .How many
days' wages will be held back under the new system on each pay day?

Remarks: ...................................................
.............................

*Signature of Corporation.*

Dated...........189

### CIRCULAR TO LABOR ORGANIZATIONS.

OFFICE OF FACTORY INSPECTOR, ⎫
ALBANY, *June,* 1890. ⎬

*To the officers and members of all labor organizations in the State of
New York:*

GENTLEMEN.—Permit me to call your attention to the provisions of
Chapter 388 of the Laws of 1890, the full text of which is printed
herewith, and the enforcement of which devolves upon the Factory
Inspectors.  Inasmuch as this act was passed in the interest of the
working people of the State, I respectfully request your coöperation
in making the law effective.  Any information relative to violations
thereof will receive prompt attention, and will be regarded as strictly
confidential.

Very truly yours,

JAMES CONNOLLY,

*Factory Inspector.*

[Here followed a copy of the law.]

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 7 of 50

## HOW WEEKLY WAGE PAYMENTS HAVE BEEN ENFORCED.

There are on record, in the Secretary of State's office, the certificates of incorporation of about 40,000 corporations. There is no means of knowing how many of these are now in existence, but a great portion of them are defunct, the number of which it is not easy to estimate, for the reason that many of their officers have been exceedingly lax in making annual returns as required by law. A considerable part of those in actual legal existence do not employ any persons who come within the obvious intent of the law, their employés being principally officers. Five thousand blanks were sent out requesting information from such corporations as were specifically mentioned in the statute, and the returns from such as replied are tabulated and printed herewith. Blanks were also sent to all municipalities within the State, notifying the officials thereof that their employés were embraced within the provisions of the act, and requesting that the Factory Inspector be informed what course was to be pursued by them with reference to it. Most of these were returned, and are also presented in tabulated form in the succeeding pages of this report.

It is to be regretted that there was nothing in the law to compel the corporations affected to file a statement of their methods of paying wages. The majority of those which replied had been paying weekly as the law directed, and of course they had no objection to so stating. Most of the corporations which had not been paying weekly, did not respond to our queries — some for the purpose of keeping the Inspector uninformed of their continued violation of the law, and others, who had unwillingly conformed to the law after its passage, accepted it so ungraciously as to refuse to acknowledge in writing that they had complied. For these reasons the information at hand is somewhat meagre, but sufficient has been gathered by replies to circular and personal visits to demonstrate that the act has

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 8 of 50

been obeyed by ninety-nine per cent. of the corporations concerned, which is a pretty good showing, all things considered.

The law as drawn has occasioned a vast amount of correspondence, and given rise to almost numberless questions as to how it should be construed in the special cases which were presented from nearly every locality. These questions were sometimes of a delicate nature, inasmuch as they involved the financial integrity of the companies, who found themselves embarrassed from being compelled to settle the wages of their employés oftener than the incoming cash and the business methods theretofore pursued would allow. The Inspectors were beset with appeals from the employés on the one hand to immediately enforce the law, and on the other the officers of some of the companies would ask for time to make the necessary changes in their business to enable them to meet its requirements, or go further and urge that they be entirely exempted from its operation, basing their request on the ground of some peculiarity in situation, the character of their employés, or the distance to the nearest bank, etc. Common sense being a good guide in enforcing such a radical new law, it was our purpose to obtain compliance with it by causing as little friction as possible, and by giving ample time to those whose business affairs would not with safety permit a sudden departure in the method of disbursing a large amount of cash. In some industries the labor cost is the largest item of expenditure, and it is well known that at times it is difficult for many employers to raise the necessary money to meet the wages of their workmen on pay day, especially during certain seasons of the year, when the outlay is great and the receipts small. That it was more difficult for some of these corporations to pay once a week than once a month was made plain in a number of cases which came under my observation since the Weekly Payment law was enacted, and I did not deem myself justified in prosecuting such concerns until they had at least a chance to conform to its requirements without

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM

NYSCEF DOC. NO. 23

INDEX NO. 720074/2019

RECEIVED NYSCEF: 09/08/2020

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 9 of 50

causing disaster to their investments and idleness to their
employés. In no case have I presumed to permanently
exempt a corporation from the operation of the law because
of any embarrassment; but in those instances where a little
delay would enable them to overcome their difficulties, I
have not been harsh in demanding a prompt and immediate
obedience to the law. At the date of this writing, all cor-
porations which had deferred paying weekly through lack
of available resources and, therefore, asked for time to obey
the legislative mandate, have notified me that they are now
paying their workmen regularly every week.

## TRICKERY TO AVOID WEEKLY PAYMENTS.

No sooner had the Weekly Payment law been enacted
than the officers of some few corporations set themselves
to the task of defeating its purposes. This was sought to
be accomplished, in some instances, by the posting of
notices to the effect that, on a certain date and every week
thereafter, any of the employés who desired it, would be
paid weekly, by leaving word at the office that such was
their wish. As soon as the notices were up, quiet hints
would be dropped from authoritative sources that who-
ever insisted on being paid weekly would be discharged.
Naturally, very few men desirous of employment would
have the temerity to ask for their wages, with possible
discharge as the result, and consequently no one would
apply for his wages on the date set. The purpose of the
officers of the corporation would be accomplished, and
when the Factory Inspector would inquire why the wages
were not being paid weekly, the notices were shown, and
the triumphant answer given that not one man wanted
his wages weekly. On more than one occasion this was
the answer, when at that very time the inspector had in
his pocket the statement of the men and a long list of their
names, asking that the company be compelled to pay them,
one and all, every week.

To meet this very apparent corporate dodge, we pointed
out the fact that by implication the terms of the law

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 10 of 50

required the company to make a personal tender of his wages to each and every employé once a week, regardless of any previously expressed wish to the effect that he did not want his wages, provided he was present at his place of labor at the regular time of payment. If the employé saw fit to refuse his money when thus offered, he could do so, and the company need not force it upon him; but he must be given the opportunity to so refuse, and the refusal once or oftener did not affect the necessity on the part of the company to again tender him the full amount of his wages on each succeeding pay day. The enforcement of this rule brought quite a number of concerns to a reluctant obedience of the letter and spirit of the statute.

Another subterfuge, and it remains to be seen whether it will be successful, has been tried by a number of corporations. These have entered into an alleged agreement or contract with their foremen, superintendents, or other individuals, to take charge of their works, hire the hands and turn out the finished product by contract, the corporations apparently surrendering all control of the management of the business, excepting to take the finished product from the alleged contractors at a certain price. These contractors, hiring and discharging the hands as private individuals would do, and without any surface connection with the company, of course could pay the employés how and when they pleased, inasmuch as the law applies only to corporations. Shortly after it went into effect, I received information that the St. Regis Leather Company, of St. Regis Falls, Franklin county, had in this manner turned over its plant to its superintendent, who, it was related, called the men employed together, discharged them in a body, and at the same time notified them that he would himself hire all those who wished to stay, but that they would be paid only by the month. A store was run by a relative of this superintendent, and it was understood that the employés must patronize it, the amount of their accounts to be regularly deducted from their wages. I caused a suit to be instituted against this company for the purpose of testing the ques-

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 11 of 50

tion as to whether a corporation could in this manner divest itself of its duties in order to shirk obedience to a law. This suit is now pending. Its decision will affect other corporations who have resorted to the same line of policy with respect to the Weekly Payment law as did the St. Regis Leather Company, unless the Legislature sees fit in the meantime to amend the act so as to prohibit such practices. This ought to be done in order to remove all doubt about the intention of the Legislature, and at the same time place corporations which will otherwise evade the law on the same footing as those who are willing to comply with its requirements.

### INDIVIDUAL EMPLOYERS AND PARTNERSHIPS AND WEEKLY PAYMENT OF WAGES.

I have been in daily receipt of complaints to the effect that this, that and the other individual or private firm is not obeying the law requiring the weekly payment of wages. Of course the act does not embrace these, but it is difficult to convince some of the complainants that we are not permitting a few favored parties to violate the law. While this indicates a lively interest among wageworkers in favor of weekly wage payments, it is also evidence that the law calls upon corporations to pursue a business policy from which individual employers and copartnership concerns are exempt. Whether the system of paying wages weekly is a hardship or not, from a business standpoint, is a question for each person interested to settle for himself, but the belief that it is an unreasonable restriction is certainly held by the officers of many corporations, who assert that it gives their private rivals an advantage not compensated for by any privileges allowed to corporations.

It is, I believe, a settled principle of law that the State can not interfere to compel firms or individuals to pay the wages of their employés weekly. But it will not strike the person who is employed and paid monthly, or at greater intervals, as being any advantage to him to have his pay withheld for a considerable time by a private employer,

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 12 of 50

when he could obtain it more frequently from a corporation. This is the view taken by many of our complaining correspondents. Yet perhaps the effect of compelling corporations to pay wages weekly will be to extend the system to other employers of labor, in the course of time, without legislation.

## "PLUCK-ME" STORES.

An evil that should be eradicated by vigorous legislation is grimly styled the "pluck-me" store by those who are so unfortunate as to become its unwilling patrons. These stores are places owned and conducted by corporations and persons who employ large numbers of people in the rural districts. The rule generally adopted by these employers requires that all goods, groceries and provisions which are consumed by the employés and their families must be obtained at the "pluck-me" store at prices from which there is no appeal, but which are always from twenty to 100 per cent. higher than the cost of the same class of goods where there is freedom of trade. The accounts between the employé and the store are "balanced" occasionally by crediting the amount of wages due the workman for labor to his account for the necessaries of life. Beyond the readily perceived and generally understood fact that great injustice is perpetrated by this "pluck-me" 'store system, the whole commonwealth should interest itself in a movement to abolish it. Wherever it exists the people directly concerned are, from the very nature of things, made to feel their dependent situation and bow to the autocratic power of the overseer or superintendent of the company, and are also encouraged in lives of extravagance and shiftlessness in order to swell the profits of their employers through the proceeds from the store. In some districts of this State the abolition of the "pluck-me" stores would be of more benefit to the people than weekly payment of wages. Of course, where wages are paid every week there is some opportunity for the workman to use his money to the best advantage; but if he is compelled by an iron rule to purchase only from his employer, who subtracts the grocery

bill from the weekly wage, there is very little opportunity for independence or thrift. The Weekly Payment law should be amended so as to compel the settlement of wages to be made in *cash*, instead of due bills and store orders, and prohibiting some of the classes of corporations now mentioned in the law from adding a grocery and provision trade to their mining and manufacturing pursuits.

## RAILWAY CORPORATIONS.

It is earnestly to be hoped that the great railway corporations of this State will be brought within the provisions of the Weekly Payment law by a proper amendment. The complaint from their employés has been loud and long, and is based on no imaginary grievance. When a man is employed on a railroad he must work from six to eight weeks before he receives a cent for his labor. Sometimes he is kept out of his pay longer than this, the matter depending upon the caprice of the paymaster or the condition of the stock market. A month's pay is invariably held back by the company, not as a "guarantee of good faith," but because the company has the brute power to hold it, and for the interest to be obtained thereon, which does not go to the man who has earned the money and to whom it rightfully belongs. If discharged, a railway employé is usually kept out of his pay until the next visit of the paymaster, no matter how far off that may be. All the arguments which have been advanced in favor of weekly payment of wages to other classes of workmen are applicable with redoubled force to the case of railway operatives.

## NO LEGAL COUNSEL OR EXPENSES PROVIDED FOR.

At the outset we were hampered in our efforts to enforce the Weekly Payment law by the fact that no appropriation had been made to defray the necessary expenses involved in putting it into effect. This was well known by the enemies of the law, and some corporations seemed inclined

Case 1:23-cv-04541-DEH-JLC    Document 63-2    Filed 06/24/24    Page 14 of 50

to take advantage of our embarrassment in this respect.
We were therefore compelled to either drop the matter
entirely or draw upon the money appropriated for the pur-
pose of enforcing the factory laws, which latter course it
was decided to pursue in order to satisfy the public demand
for the establishment of the weekly payment system. In
so doing, we combined the service of inspection with the
work of obtaining compliance with the Weekly Payment
act, in such a manner as to cover the ground for both pur-
poses at the same time. By this method it was necessary
only to pay the cost of printing, addressing and mailing
copies of the Weekly Payment law, which is not a con-
siderable item.

In the matter of counsel we were much more embarrassed,
however. While the act placed upon the Attorney-General
the duty of prosecuting delinquents, it contained no provi-
sion for additional assistance in his office or authority
to hire such assistance. When it was found necessary
to institute proceedings against certain municipalities
and corporations for neglect to comply with the statute,
I notified the Attorney-General and requested that he
deputize one of his assistants to conduct the cases.
He courteously informed me of his inability to do so
for the reason that his force was inadequate to meet
the demands then made upon their time, and that
the appropriation for his department was not more
than sufficient for his usual expenses, and consequently he
had no available funds from which additional assistance
could be paid. Without legal counsel nothing could be
done, and all our work so far would have been useless, for
unless we had an attorney to prepare our cases and make
effective the notices served upon dilatory corporations
they would not heed them and would go on violating the
law. In this dilemma I was forced to seek outside aid, and
trust to the sense of justice of the Legislature to ratify
my action and compensate such legal adviser as I should
select. I therefore requested the Attorney-General to

110          Fifth Annual Report of the

authorize John T. McDonough, Esq., of Albany, and Wallace T. Foote, Jr., Esq., of Port Henry, to represent him and act as counsel for the Factory Inspector in enforcing the Weekly Payment law. The following is the correspondence on the subject:

### Request for Counsel.

Office of Factory Inspector,
Albany, *July* 30, 1890.

Hon. Chas. F. Tabor, *Attorney-General, Albany, N. Y.:*

Dear Sir.— From several places in this State reports have reached this office of violations of Chapter 388 of the Laws of 1890, known as " the Weekly Payment act."

In order to take proper action for the enforcement of that law, it is necessary that I should have the advice and services of counsel.

I therefore respectfully request you to authorize some competent attorney to appear in your behalf and to conduct such actions or proceedings as may be deemed proper for the purpose of enforcing the law in question.

Respectfully yours,

(Signed.)          JAMES CONNOLLY,

*Factory Inspector.*

———

### Reply Thereto.

Attorney-General's Office,
Albany, *July* 30, 1890.

Hon. James Connolly, *Factory Inspector, Albany, N. Y.:*

Dear Sir.— Your letter of July 30th received, regarding appointment of counsel to assist you in enforcement of Chapter 388 of the Laws of 1890.

I would prefer that you select a proper person in whom you have confidence, and I will be glad to designate him as an assistant with power to act in the matter.

Yours truly,

(Signed.)          CHARLES F. TABOR,

*Attorney-General.*

FACTORY INSPECTORS. 111

## JOHN T. MCDONOUGH, ESQ., SUGGESTED.

OFFICE OF FACTORY INSPECTOR, }
ALBANY, *July* 31, 1890. }

Hon. CHARLES F. TABOR, *Attorney-General, Albany, N. Y.:*

DEAR SIR.— Your favor of the thirtieth instant has been received, informing me that you will designate such counsel as I might approve of and which might be satisfactory to you, to assist this department in the enforcement of Chapter 388 of the Laws of 1890.

I am very grateful for your prompt and favorable action in this matter, and respectfully suggest the name of John T. McDonough Esq., of Albany, as such counsel, to act in such cases as may be brought and until further notice.

I am yours very truly,

**JAMES CONNOLLY,**

*Factory Inspector.*

———

## MR. MCDONOUGH APPOINTED.

ATTORNEY-GENERAL'S OFFICE, }
ALBANY, *August* 1, 1890. }

*To whom it may concern :*

This is to certify that, subject to revocation, I have this day appointed, designated and deputized, and do hereby appoint, designate and deputize, for the purposes hereinafter mentioned, John T. McDonough, of Albany, N. Y., an attorney-at-law, to appear for me and in my name and stead, in any court having jurisdiction, and hereby give him full power and authority to commence and prosecute to judgment any and all actions or proceedings directed or authorized to be brought by the Hon. James Connolly, Factory Inspector, and to assist the said Factory Inspector in the enforcement by him of the provisions of Chapter 388 of the Laws of 1890, and for violations of said law. This appointment as aforesaid is made at the request of the said Factory Inspector, and because I am unable, on account of other official engagements, to personally attend to the duties made necessary by said act.

In witness whereof I have hereunto set my hand and seal the day and year first above written.

(Signed.)     **CHARLES F. TABOR,**

*Attorney-General.*

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM INDEX NO. 720074/2019
NYSCEF DOC. NO. 23 Case 1:23-cv-04541-DEH-JLC Document 63-2 Filed 06/24/24 Page 17 of 50 RECEIVED NYSCEF: 09/08/2020

ADDITIONAL COUNSEL REQUESTED.

OFFICE OF FACTORY INSPECTOR, }
ALBANY, *October 4, 1890.* }

Hon. CHARLES F. TABOR, *Attorney-General, Albany, N. Y.:*

DEAR SIR.—It being necessary to bring action against a number of corporations in the northern part of the State for violations of Chapter 388 of the Laws of 1890, commonly called the Weekly Payment law, and from the distance and expense, it being inadvisable to call upon John T. McDonough, Esq., of Albany, to conduct the necessary suits, I respectfully request that you designate Wallace T. Foote, Jr., Esq., of Port Henry, Essex county, as my counsel in such cases. I have every confidence in his ability and judgment.

Respectfully yours,

(Signed.) JAMES CONNOLLY,

*Factory Inspector.*

---

WALLACE T. FOOTE, JR., ESQ., APPOINTED.

ATTORNEY-GENERAL'S OFFICE, }
ALBANY, *October 6, 1890.* }

*To whom it may concern:*

This is to certify that, subject to revocation, I have this day appointed, designated and deputized, and do hereby appoint, designate and deputize, for the purposes hereinafter mentioned, Wallace T. Foote, Jr., of Port Henry, Essex county, an attorney-at-law, to appear for me and in my name and stead, in any court having jurisdiction, and hereby give him full power and authority to commence and prosecute to judgment any and all actions or proceedings directed or authorized to be brought by the Hon. James Connolly, Factory Inspector, and to assist the said Factory Inspector in the enforcement by him of the provisions of Chapter 388 of the Laws of 1890, and for violations of said law. This appointment, however, is not to interfere with or be held to include any actions brought by my authority or any actions which John T. McDonough, of Albany, has been deputized by me to conduct. This appointment, as aforesaid, is made at the request of the said Factory Inspector, and because I am unable, on account of other official engagements, to personally attend to the duties made necessary by said act.

In witness whereof, I have hereunto set my hand and seal the day and year first above written.

(Signed.) CHAS. F. TABOR,

*Attorney-General.*

Messrs. McDonough and Foote, who, as will be seen by the foregoing correspondence, were designated by the Attorney-General to advise and assist this department in enforcing the law, have rendered valuable service in this respect, and are still doing so, and I therefore earnestly request that a sufficient appropriation be made to pay them for services rendered. It will also be necessary, if the law is to be enforced, to appropriate sufficient money, either for this department or that of the Attorney-General, to pay lawyers to prosecute such corporations as may in future refuse to conform to the law.

## MUNICIPAL EMPLOYÉS.

The employés of a number of cities and towns of the State having expressed a desire to be paid weekly, and believing that they were included in the Weekly Payment law, I urged the officers of all municipalities of the State to conform to this desire. This was promptly done in the city of Brooklyn by order of Mayor Chapin under advice of Corporation Counsel Jenks, and also in some minor towns and villages. The legal advisers of New York, Albany, Troy, Buffalo and a few other cities maintained that the law did not apply to the salaried employés of their respective municipal corporations, while those of Brooklyn, Hornellsville, and I believe Utica, Rochester and other cities, were of the opinion that the law required the payment of wages weekly to city employés. In order to test the matter in the courts, notices of commencing suits to recover the penalty prescribed by law were served upon the officials of New York, Albany, West Troy and Buffalo. Recognizing in part the justice of the claims of city employés for more frequent payment of wages, the authorities of Buffalo decided to pay semi-monthly instead of monthly as before, and in order to test the question of weekly payments in the courts without unnecessary delay, the Corporation Counsel of that city also consented to agree upon the facts and submit a test case to the General Term of the Supreme Court. This was the quickest method of obtaining a judi-

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM INDEX NO. 720074/2019
NYSCEF DOC. NO. 23 RECEIVED NYSCEF: 09/08/2020

Case 1:23-cv-04541-DEH-JLC Document 63-2 Filed 06/24/24 Page 19 of 50

cial interpretation of the act as it related to municipal
employés, and accordingly a case was agreed upon, sub-
mitted and argued. Following are the principal documents
in the case:

SUPREME COURT — ERIE COUNTY.

THE PEOPLE OF THE STATE OF
    NEW YORK, PLAINTIFF,

*against*

THE CITY OF BUFFALO, DEFENDANT.

*Whereas*, A controversy exists between the people of the State of
New York, of the one part, and the city of Buffalo, of the other part,
as follows : The said people of the State of New York claim that the
said city of Buffalo is indebted to the people of the State of New
York in the sum of fifty dollars, being the amount of five penalties of
ten dollars each which accrued to the said people of the State of New
York under and by reason of violation by said city of Buffalo of the
provisions of Chapter 388 of the Laws of 1890, entitled "An act to
provide weekly payments of wages by corporations," in that the said
city of Buffalo failed and neglected to pay weekly to the persons
hereinafter named, who, the said people of the State of New York
claim, are employés of said city of Buffalo and engaged in its business,
the wages earned by them. The claim of said people of the State of
New York is more fully hereinafter set forth ; and

*Whereas*, Upon its part the said city of Buffalo claims that it is not
liable to pay said penalties, or any of them, under the statute afore-
said for reasons which are fully hereinafter set forth ; and

*Whereas*, The said parties have agreed to submit the said contro-
versy to the Supreme Court of the State of New York, fifth department,
under the provisions of article 2 of title 2 of chapter 2 of the Code of
Civil Procedure.

Now, therefore, the following facts are conceded and stipulated by
said parties for the purpose of such submission, to wit :

I. That the city of Buffalo is a domestic municipal corporation, duly
incorporated by and under the laws of the State of New York.

II. That on the 23d day of August, 1890, John Franey, who is the
Assistant Factory Inspector of the State of New York, caused to be
served on said city of Buffalo a notice in writing, of which the follow-
ing is a true copy :

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 20 of 50
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020

"STATE OF NEW YORK :

"OFFICE OF FACTORY INSPECTOR,
"ALBANY, *August* 23, 1890.

"*To the City of Buffalo:*

"You are hereby notified that an action will be brought against you as a municipal corporation for neglecting, failing and refusing to comply with the provisions of Chapter 388 of the Laws of 1890, requiring you to pay weekly each and every employé engaged in your business.

"JOHN FRANEY,
"*Assistant Factory Inspector.*"

And that said notice was duly signed by said John Franey as such Assistant Factory Inspector.

III. That prior to the 1st day of September, 1890, pursuant to the provisions of the charter and ordinances of said city of Buffalo, Charles F. Bishop, who is the Mayor of said city, as such Mayor duly appointed John D. Goshleski license clerk in the Mayor's department of said city, and said John D. Goshleski accepted said appointment and entered upon the performance of his duties as such clerk, and acted as such clerk in business hours during the period of time from the 1st day of September to the 23d day of September, 1890, inclusive, and held such position under said appointment during said time, and that, pursuant to the provisions of said charter and ordinances, the said Goshleski became and was entitled to receive for his services as such clerk a salary at and after the rate of $1,200 per annum, which salary prior to said 1st day of September, 1890, had been paid to him by said city of Buffalo in monthly payments of $100 each, and that said salary was not, nor was any part thereof paid, offered or tendered to said Goshleski or received by him weekly and to within six days of the date of such payment, during said period between the first and twenty-third days of September, inclusive, although he was not, during said period of time, absent from his regular place of labor at any time when his said salary would have been paid to him had the same been paid weekly.

IV. That prior to said 1st day of September, 1890, pursuant to the provisions of the charter of said city of Buffalo, the Park Commissioners of said city duly appointed George H. Selkirk secretary and treasurer of said Park Commissioners, and the said Selkirk accepted said appointment and entered upon the performance of his duties as such under said appointment, and acted as such in business hours during the period of time from the 1st day of September to the 23d day of September, 1890, inclusive, and that pursuant to the power

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 123
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 21 of 50

vested in the said park commissioners by the said charter they fixed
the amount of the compensation of said Selkirk for his said services
at and after the sum of $1,600 per annum, and that prior to said 1st
day of September, 1890, said compensation was paid in monthly
payments of $133.33, and that said salary was not, nor was any part
thereof, paid, offered or tendered to said Selkirk or received by him
weekly and to within six days of the date of such payment during
said period of time between the said 1st and 23d days of Septem-
ber, inclusive, although during said period of time neither of them was
absent from his regular place of labor at any time when his said com-
pensation would have been paid to him had the same been paid weekly.

V. That prior to said 1st day of September, 1890, pursuant to the
provisions of the charter and ordinances of said city of Buffalo,
James F. Crooker, who is the Superintendent of Education of said city
and head of the educational department, as such Superintendent hired
George H. Stowitts as a school teacher to be employed in one of the
public schools of said city, and said Stowitts accepted said employ-
ment and entered on the performance of his duty as such teacher, and
acted as such teacher under said hiring in business hours during the
period of time from the 1st day of September to the 23d day of Sep-
tember, 1890, inclusive, and that pursuant to the provisions of said
charter and ordinances, and of the terms of said contract of hiring the
said Stowitts became and was entitled to receive as compensation for
his services a salary of $1,500 per annum, which said compensation
prior to said 1st day of September, 1890, had been paid to him by said
city of Buffalo in monthly payments of $125 each, and that said salary
was not, nor was any part thereof, paid, offered or tendered to said
Stowitts or received by him weekly and to within six days of the date
of such payment, during said period between the 1st day of Sep-
tember, 1890, and the 23d day of September, 1890, inclusive, although
he was not, during said period of time, absent from his regular place
of labor at any time when his salary would have been paid to him had
the same been paid weekly.

VI. That prior to the 1st day of September, 1890, the board of Fire
Commissioners of the city of Buffalo, pursuant to the provisions of
the charter and ordinances of said city, duly appointed John H.
Brewster as a fireman and member of the fire department of said
city under the said commissioners, to hold his position during the
pleasure of said board, and the said Brewster, accepted said posi-
tion and entered upon the performance of his duties as such fire-
man, and acted as such fireman under said appointment in business
hours during the period of time from the 1st to the 23d day of Sep-

tember, 1890, inclusive, and that the common council of said city of Buffalo fixed $1,000 per annum as the salary of firemen of the rank of said Brewster, which salary prior to said September 1, 1890, had been paid to him by said city of Buffalo in monthly payments of eighty-three dollars and thirty-three cents each, and that said salary was not, nor was any part thereof, paid, offered or tendered to said Brewster or received by him weekly and to within six days of the date of such payment, during said period between the 1st day of September, 1890, and the 23d day of September, 1890, inclusive, although he was not, during said period of time, absent from his regular place of labor at any time when his salary would have been paid to him had the same been paid weekly.

VII. That prior to the 1st day of September, 1890, pursuant to the provisions of Chapter 436 of the Laws of 1880, entitled "An act to establish a police department in the city of Buffalo, and provide for the government thereof," and of the several amendments thereto, the Board of Police of the city of Buffalo duly appointed Michael Collins a patrolman on the police force of said city, and the said Collins accepted said appointment and entered upon the performance of his duties as such policeman and patrolman at all times between the 1st day of September and the 23d day of September, 1890, inclusive, under said appointment.  That pursuant to the laws aforesaid the said Collins became and was entitled to receive for services a salary of $900 per annum, which salary prior to said 1st day of September, 1890, had been paid to him by said city of Buffalo in monthly payments of seventy-five dollars each, and that said salary was not, nor was any part thereof, paid, offered or tendered to said Collins or received by him weekly and to within six days of the date of such payment, during said period between the 1st day of September, 1890, and the 23d day of September, 1890, inclusive, although he was not, during said period of time, absent from his regular place of labor at any time when his salary would have been paid to him had the same been paid weekly.

VIII. None of the admissions herein contained are in anywise to affect either party, or to be regarded as made, except for the purposes of the submission of this controversy, nor are they to be regarded as admissions of the legal construction to be placed on any provision of the charter or ordinances of said city, and for this purpose the charter and ordinances of the city of Buffalo may be read and referred to as if they were public laws and acts.

IX. That the payment of the foregoing salaries monthly heretofore has been solely based on a custom on the part of the Common Council

fixed
vices
d 1st
nthly
part
him
ring
tem-
was
com-
ekly.
the
falo,
city
ired
the
loy-
a..d
the
Sep-
said
the
for
ion
said
ary
said
ate
ep-
gh
ace
ad

ire
of
H.
id
he
si-
e-
ss
p-

118                    FIFTH ANNUAL REPORT OF THE

of said city and has not been required by the terms of any contract between the parties or of any law or ordinance.

X. The questions submitted to this court upon this case are as follows:

Between the 1st and 23d day of September, 1890, inclusive, were John D. Goshleski, George H. Selkirk, George H. Stowitts, John H. Brewster and Michael Collins, or any of them, employés of said city of Buffalo engaged in its business, within the provisions and terms of chapter 388 of the Laws of 1890, and were said salaries wages earned by them so as to entitle them to be paid weekly, and to within six days of the date of such payment; and, if so, how many of them were such employés?

XI. Upon the foregoing conceded facts the people of the State of New York claim and assert that each and every one of said five persons was an employé of said municipal corporation, during said period of time, within the meaning of said act, whose salaries were wages earned within the meaning thereof, and that they were entitled to be paid their wages weekly pursuant to the provisions of said act.

XII. Upon the said facts the said city of Buffalo claims and asserts that said persons were not employés of said city within the meaning of said act; that the said salaries were not wages within the meaning thereof; and that, if such salaries were wages, they were not earned within the meaning thereof; and, further, that said Weekly Payment law is not applicable to said offices and positions.

XIII. If the court decides that said persons are employés of said city of Buffalo, as claimed by said people, then judgment is to be rendered in favor of the people of the State of New York and against the said city of Buffalo for the sum of ten dollars for each and every one of said persons who were employés as aforesaid, with costs and disbursements. If answered in the negative, as to all of said persons, then judgment is to be rendered in favor of said city of Buffalo for costs and disbursements.

In testimony whereof, Charles F. Tabor, as the Attorney-General of the State of New York, has hereunto set his hand in behalf of the people of the State of New York, and the said city of Buffalo has hereunto set its seal and caused these presents to be subscribed by its corporation counsel, W. F. Worthington, this 27th day of September, 1890.

CHARLES F. TABOR,
*Attorney-General.*

W. F. WORTHINGTON,
*Corporation Counsel for the City of Buffalo.*

The following is the brief of John T. McDonough, Esq., counsel for the Factory Inspector:

BRIEF OF JOHN T. MCDONOUGH, ESQ. — PLAINTIFF'S POINTS.

This action is brought under the provisions of Chapter 388 of the Laws of 1890, entitled " An act to provide for the weekly payment of wages by corporations," to recover five penalties claimed by the people on account of the failure and neglect of the city of Buffalo to pay weekly the wages earned, between September 1 and 23, 1890, by John D. Goshleski, a clerk in the Mayor's office; by George H. Selkirk, secretary and treasurer of the Park Commissioners; by John H. Brewster, a member of the fire department of said city; by George H. Stowitts, a school teacher, and by Michael Collins, a patrolman on the police force.

Section 1 of the act in question provides: "Every manufacturing mining or quarrying, lumbering, mercantile, railroad, surface, street' electric and elevated railway (except steam surface railroads), steamboat, telegraph, telephone and municipal corporation, and every incorporated express company and water company shall pay weekly each and every employé engaged in its business the wages earned by such employé to within six days of the date of such payment, provided, however, that if at any time of payment any employé shall be absent from his regular place of labor he shall be entitled to said payment at any time thereafter upon demand."

The plaintiff claims that under the provisions of said act requiring every municipal corporation to pay weekly *each and every employé engaged in its business*, the wages earned by such employé, the above-named persons were such employés, and because of the failure to pay them weekly the defendant has violated the law.

The defendant, on the contrary, contends that these men are not employés of the city of Buffalo, engaged in its business, but are officers appointed to perform a public duty, laid not upon the city, but upon ᵗhe officer, in which the city has no private interest, and from which it derives no special benefit or advantage.

POINTS.—The appointment or employment of the persons above mentioned is provided for as follows:

*Mayor's clerk.* —  *  *  *  "The mayor may appoint a clerk." (Charter of Buffalo, title II, § 24, chap. 519, Laws 1870.)

*Secretary and treasurer of the park commissioners.*—" The park commissioners shall have full and exclusive power  *  *  *  to appoint such engineers, surveyors, clerk, and other officers as may be necessary  *  *  *  and to fix the amount of their compensation." (Charter, title IV, § 23.)

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 25 of 50

The park commissioners consist of fifteen commissioners, appointed by the mayor, with the consent of a majority of the common council. (Charter, title IX, § 22.)

*School teachers.*—"The city has power to establish, maintain and regulate public schools in the city." (Charter, title XI, § 1.)

"The superintendent of education shall be the head of the educational department * * *. He shall select the teachers to be *employed* in the different schools, and *hire* them for the period of time, at the compensation and upon the terms and conditions provided by ordinance. The teachers shall be subject to his orders and directions. He may suspend for cause, and, after a hearing, with the concurrence of the mayor, dismiss any teacher." (Charter, title XI, §§ 1 and 11.)

"All teachers * * * shall be *hired* for the term of one year. * * * No teacher shall be *employed* who is not of good moral character. * * * The *salaries* of teachers shall be such as shall be fixed by the common council. * * * All *contracts* made by the superintendent for the *hiring* of teachers shall be in writing." (City ordinances, chap. 6, § 37.)

The superintendent of education is elected on the general city ticket, and is a city officer. (Charter, title I, § 1.)

*Firemen.*— "The city has power to establish, maintain and regulate a fire department. * * *

"The mayor is authorized to appoint three fire commissioners.

"The board shall certify and deliver to the comptroller a statement of the expenses and the amount of money required for the support of the department for the ensuing year. * * * All payments * * * shall be made by the treasurer of the city upon warrants authorized by the common council.

"The said board shall have power to appoint a chief engineer * * * and such number of assistants as they may deem necessary. * * * They shall also appoint such other officers and employés as may be deemed necessary, * * * who shall hold their positions during the pleasure of the board. They shall, by and with the approval of the common council, fix the salaries and prescribe the duties of all *officers* and *members* of the department." (Charter, title XIII, §§ 1, 2, 7 and 8; ordinances, chap. 5, §§ 1, 2, 3, 4, 5, 6, etc.)

*Policemen.*— "The city of Buffalo shall hereafter constitute a separate police district, and a police department is hereby established therein. (Chap. 436, Laws 1880, § 1.)

"The management and control of said department * * * are vested in a board of commissioners, * * * to be composed of the mayor, *ex-officio*, and two members to be appointed by the mayor. (§§ 3 and 4.)

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 26 of 50

"The said board of police shall *appoint* the police force.   (§ 8.)

"The board of police shall fix the salaries of  * * *  patrolmen, etc., which salaries shall be paid monthly.  * * *  The common council shall order the payment of the same out of the police fund. (Ib., § 36.)

"The city of Buffalo shall provide for the payment of the expenses of the police department.   (Ib., § 39.)

*Removal of officers.*—"The mayor shall have power to suspend or remove officers of the city, whether elected or appointed, for misconduct or neglect of duty."   (Charter, title II, § 24.)

II. The Weekly Pay act is a remedial statute and should receive a liberal construction.   Its object is to enable all the employés of the city to obtain speedy payment of their wages, in order that they may have the benefit of being able to make their purchases for *cash*, avoid book accounts, store-pay, and the usurers who are accustomed to make fifty or sixty per cent. per annum on money invested in "buying time."

To give this law the force, effect and construction claimed for it by the plaintiff, would work no harm to the defendant, and yet would be of great benefit to a large number of persons who are employed in the police, fire and school departments of the city.

There are words in this statute which are susceptible of different meanings, and if the court shall give them the narrow, strained and limited meaning, which has been placed upon them by several attorneys for municipal corporations, then the word municipal corporation might as well be expunged from this act, for it will in that case only affect a few day laborers, who work with the pick, shovel, or broom. On the contrary, if given a broad, liberal and sensible construction, it will accomplish a most beneficial purpose, and remedy a wrong that for years has had the attention of the Legislature.

So far as the Factory Inspector has been informed, only one municipality, Brooklyn, has given the statute this broad and liberal construction, holding that it applies "to all persons, without exception," who are in the service of the city, and consequently policemen, firemen, clerks and other officers, as well as day laborers were paid weekly.

Other cities, disregarding the rule laid down in Bell v. The Mayor, etc. (105 N. Y., 139), to the effect that "the exact and literal meaning of an act may be rejected, if upon a survey of the whole act and the purpose to be accomplished, or the wrong to be remedied, it is plain that such exact or literal reading of the words would not carry out the legislative intent," hold to the narrow and limited view of this

**122**    FIFTH ANNUAL REPORT OF THE

law, and claim that by reason of the use of the word "employé" instead of "officer" and the word "wages" instead of "salary" that the Legislature intended the law to apply solely to workmen of the grade of "laborers, servants and apprentices," as those words have been construed by the courts.

III. It does not follow that because of the use of the word "wages" instead of "salary" the Legislature intended thereby to confine the provisions of this act exclusively to persons rendering services in a menial or subordinate capacity.

Wages and salary are synonymous terms as used in this statute. Webster defines wages as follows: "Compensation given to a hired person for his services.   See wage."

"Wage: Stipulated payment for services performed; hire; pay; *compensation.*

"Syn.: Hire; reward; stipend; *salary;* allowance; pay; compensation; remuneration; fruit."

Worcester defines wages: "Pay for services; hire; *salary,*" and adds the following note: "In ordinary language the term wages is usually employed to designate the sums paid to persons hired to perform manual labor; but substantially and in fact, however, the salaries of public functionaries and the fees of lawyers, physicians and other professional men are as really *wages* as the sums paid by them to menial in their service.— *Brande.*"

Wages is defined in the Imperial Dictionary as:  "The payment given for services performed; the price paid for labor; the return made or compensation paid to those employed to perform any kind of labor or services by their employers; hire; pay; meed; compensation." And this note is added: "NOTE.— In ordinary language the term wages is usually restricted to the remuneration for mechanical or muscular labor, especially to that which is paid at short intervals, as weekly or fortnightly, to workmen.   Correctly speaking, however, what is called fees of professional men, as lawyers, physicians, etc., the *salaries of public functionaries,* business men, etc., the pay of military and naval men and the like, are all wages."

The presumption is that the Legislature spoke correctly, and included *salaries* of public functionaries in "wages."

The legal signification of wages corresponds with that of the lexicographers.   Thus in Jenks v. Wheeler (37 Howard's Pr., 458), where the master of a vessel received a salary of $150 per month, it is called "wages."   In the school laws of the State, the salary or compensation of teachers is invariably called "wages," whether the

teachers are employed by the week, month or year.    (2 R. S., p. 1181, 7th ed., chap. 175, Laws of 1890.)

In the case of the Commonwealth *ex rel.* Wolf v. Butler (99 Pa. State Rep., 535), where the State constitution provided that members of the General Assembly shall receive such *salary* for regular and special sessions as shall be fixed by law and no other compensation whatever, and the Legislature fixed as compensation $1,000 for regular sessions not exceeding 100 days, and ten dollars per day for each day of the session thereafter, not exceeding fifty days, the relator served as a Member of Assembly fifty days after the expiration of the 100 days, and claimed for his services $500 in addition to the $1,000. The State Treasurer refused to pay the $500, contending that the provision for paying the ten dollars a day was not a provision for paying *salary,* but *wages,* and, therefore, unconstitutional. The courts below sustained the defendant in this view, but the Supreme Court reversed their decision.

On this point, Judge Sharswood, who delivered the opinion, said: "According to the most approved lexicographers, the words 'wages' and 'salary' are synonymous. They both mean one and the same thing — a sum of money periodically paid for services rendered.  *  *  *

"The truth is that if there is any difference in the popular sense between 'salary' and 'wages' it is only in the application of them to more or less honorable services. A farmer pays his farm hands, in common speech, wages, whether by the day, week, harvest or year. If, for any reason, he has occasion to *employ* an overseer, his compensation, no matter how measured, is called salary. An ironmaster pays his workmen wages, his manager receives a salary; a merchant pays wages to his servant who sweeps the floor, makes the fire and runs his errands, but he compensates his salesman or clerk by salary. How can it make any difference in what way the compensation is made?"

And although, popularly speaking, we may use the words "salary" and "wages" as stated by Judge Sharswood, yet all the persons mentioned by him are *employés* — the overseer, the manager, the salesman, and the clerk as well as the others.

Under this Weekly Pay act, if a clerk in a railroad office, receiving a salary of $1,200 a year, is an employé of the company, how can it be fairly claimed that the clerk in the office of the mayor of Buffalo, receiving a like salary, is not an employé of that municipal corporation?

The word "employé" can not, under the statute, be given different meanings when applied to different parts of this act.

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 29 of 50

Where the same words are used in different parts of the same act, in connection with the same subject-matter, it is contrary to settled rules of construction to give them different meanings in several places where they occur. (Potter's Dwarris, 195; Mangen v. Mayor, 98 N. Y., 592.)

Our courts, in this State, agree with the views expressed by Judge Sharswood. Thus, in Riley v. The Mayor, etc. (96 N. Y., 331), where an assistant engineer in the fire department received a salary of $1.250 per annum when on fire duty, and three dollars per day when working as a machinist in the repair shop, the court said that "he has been paid for his services at the rate of $1,250, and signed the monthly pay-roll, receipting for his *wages* in full at that rate, and while performing the duty of a machinist receipted in full for his *wages* in a similar manner at three dollars per day." (See page 334.)

In Roland v. The Mayor, etc. (83 N. Y., 372–375), Judge Danforth, speaking of a court attendant, said: "He did receive a salary — for that is only another word for compensation stipulated to be paid for services — *annual or periodical wages.*"

The cases of McLellan v. Young (54 Ga., 319), of S. & N. A. R'd Co. v. Falkner (49 Ala., 115), and Gordon v. Jennings (L. R., 9 Q. B. D., 45), are not in conflict with the cases above cited. These last cases were decided on the peculiar wording of statutes exempting wages from attachment or garnishment by creditors, and the laws received a very strict construction. And the case of Cowden v. Hoffman (10 Ind., 85) was based on the laws of Indiana existing at the time of the decision.

It follows then that the mere use of the word "wages" instead of "salary" does not, and ought not to, exclude from the benefits and provisions of this statute persons who are commonly said to receive "salaries."

IV. It may be argued, however, that the use of the word "employé," in connection with the word "wages," excludes from the provisions of this act officers of the grade of teacher, fireman and policeman.

It has been held in this State that the words "laborer and servant" do not include a contractor. (Aiken v. Wasson, 24 N. Y., 482.) That a manager of a mining company is not "*a laborer, servant or apprentice*" within the provisions of the Manufacturing act of 1848, holding stockholders individually liable for the debts due from the corporation to laborers, servants and apprentices. Hill v. Spencer (61 N. Y., 274); and in Wakefield v. Fargo (90 N. Y., 217), under the same act, it was held that a book-keeper was not embraced in "laborers, servants

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 30 of 50

and apprentices." In this last case Judge Danforth clearly stated the reasoning upon which this class of decisions is based: "To the language of the act must be applied the rule common in the construction of statutes, that when two or more words of analogous meaning are coupled together, they are understood to be used in their cognate sense, express the same relations, and give color and expression to each other. Therefore, although the word 'servant' is general, it must be limited by the more specific ones, 'laborer and apprentice,' with which it is associated, and be held to comprehend only persons performing the same kind of service that is due from the others. It would violate this rule to hold that the intermediate or second class represented a higher grade than the first named." (P. 218.)

And this same reasoning applies to the case of the People ex rel. Satterlee v. Board of Police (75 N. Y., 38–41), where under a statute relating to "surgeons of police," to "clerks" and to "employés," it was held that power to regulate the salaries of clerks and employés did not include surgeons.

The word "employé," however, when not associated with, "laborer, servant or apprentice," embraces *officials*. Worcester defines employé: "One who is employed; *an official*; a clerk; a servant." So that while an employé need not necessarily be an official, an official is an employé.

Justice Swayne said, in Hall v. State (U. S. Sup. Ct., 23 Alb. Law Journal, 49): "An office is a public station or *employment* conferred by appointment, * * * and although an office is an *employment*, it does not follow that every employment is an office."

In the case of Gurney et al. v. Atlantic and Great Western Railway Co. (58 N. Y., 358–367, 371; S. C., 2 T. & C., 453) the court passed upon the meaning of the word "employé," and distinguished it from "laborer, servant and apprentice." In this case the receiver of the railway company was by order of the court to pay out of the net earnings, among other things, debts "owing to the laborers and employés of the said consolidated corporation, defendants, for labor and service actually done in connection with that company's railways." Jeremiah S. Black, who had been the special and general counsel of the company, claimed payment for such services. The claim was resisted on the ground that the claimant was not an employé within the meaning of the order. The General Term of this department sustained this objection upon the reasoning stated in the Aiken case, *supra*, and in the Erickson case (38 Barb., 390), and limiting the meaning of the word "employé" because of its association with the word "laborers."

The Court of Appeals reversed the decision of the General Term, holding that there was a distinction, aside from the difference in words, between the above cases and the Gurney case in the rules of construction, which should be applied.  "In those cases," said Chief Justice Church, "there was a statute liability created against stockholders, *and such statutes are always strictly construed.* Again, the courts held that it was the policy of the Legislature to protect those only who are the least able to protect themselves, and who earn their living by manual labor for a small compensation and not by professional services, and it is supposed legislative policy exerted a controlling influence upon the courts.  In this case it was entirely different.  There was no question of policy."  Again the learned justice said: "It is manifest, literally and lexically, the claimant was an employé of the company; that is, he was employed by and rendered important service for them."  And speaking of the meaning of the word employé, he said: "This is a word of more comprehensive signification than laborers and operatives."

Judge Allen, in the same case, said: "All 'laborers' and all 'employés' of the railway corporation who have 'actually done service in connection with the company's railways,' are embraced in the terms used.  None are excluded in terms or by implication, and all who come within the description are entitled to the benefit of the order.  In the absence of any intent apparent on the face of the order to discriminate between different classes of 'employés,' or different kinds of 'service,' the court can not confine it to a single class or to a particular service.  The term 'employé' is the correlative of 'employer,' and neither term has either technically, or in general use, a restricted meaning by which any particular employment or service is indicated.  The terms are applicable to attorney and client, physician and patient, as to master and servant, a farmer and day laborer, or a master mechanic and his workman.  To employ is to engage or use another as agent or substitute in transacting business, or the performance of some service; it may be skilled labor or the service of the scientist or professional man, as well as servile or unskilled manual labor."

In this same case Justice Talcott, at the General Term, defined the word 'employé' thus: "The word 'employé' is from the French, but has become somewhat naturalized in our language.  Strictly and etymologically, it means 'a person employed;' but in practice in the French language, it ordinarily is used to signify a person in some *official employment,* and as generally used with us, though, perhaps,

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM

NYSCEF DOC. NO. 23

INDEX NO. 720074/2019

RECEIVED NYSCEF: 09/08/2020

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 32 of 50

no *confined to any official employment*, it is understood to mean some permanent employment or position."

It was said in U. S. v. Maurice (2 Brockenbrough, 96–103), that "although an *office* is *an employment*, it does not follow that every employment is an office."

Dillon, in his work on Municipal Corporations (§ 976), speaks of firemen as being "*employed* and paid by the city."

In Stone v. U. S. (3 Court of Claims, 260), it was held that a man holding, under the United States government, the office of foreman of laborers, on the public grounds at Washington, was an "employé," within the provisions of a resolution of Congress providing for an increase of the salaries of "employés."

In Riley v. The Mayor (96 N. Y., 331), the court repeatedly mentions members of the New York fire department as "employés" of the department, and in People v. Police Commissioners (108 N. Y., 475), the court, in referring to the Riley case, said:   "The plaintiff in that case was an employé of the fire department."

The use of the word "employés," therefore, in the Weekly Pay act, shows a manifest intention on the part of the Legislature to include in the benefits to be derived from the enforcement of that law, not only officers of the grade of clerks, firemen, policemen and teachers, but also all other persons engaged or used by the city, to use the language of Judge Allen, "as agents or substitutes in transacting business, or the performance of some service."

V. It will be urged by the defendant that even if the word "employés" embraces officials, yet the officials named in this case do not come within the provisions of the Weekly Pay act, because that law applies to such employés only as are "*engaged in its* (the city's) *business*," and that the officials in question are engaged in the performance of public or State duties, and that while in the performance of such duties they are not the agents or servants of the city for whose conduct it is liable.

The law seems to be well settled that a municipal corporation is not liable for the *torts* of employés of the police department, fire department, health department, school department and charity department of a municipal corporation.  Thus, in McKay v. Buffalo (9 Hun., 401; 74 N. Y., 619), where a policeman, while attempting to shoot a dog, accidentally shot the plaintiff; in Maximilian v. The Mayor, etc. (62 N. Y., 160), where an employé of the commissioners of charities drove an ambulance over the plaintiff's intestate; in Ham v. The Mayor, etc. (70 N. Y., 459), where, on account of defects in the

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM

NYSCEF DOC. NO. 23

INDEX NO. 720074/2019

RECEIVED NYSCEF: 09/08/2020

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 33 of 50

water-closets of a normal school, the plaintiff's property was injured; and in Smith v. Rochester (76 N. Y., 506), where the plaintiff was injured by a hose cart running over him, it was held in each case that the municipality was not liable for the reason that the officers of these departments, and their subordinates, were "not regarded as servants or agents of the defendant, *for whose acts or negligence it is liable*, but as public or State officers with powers or duties conferred upon them by statute."

These cases, however, are to be distinguished from the one at the bar.  These simply hold that the city is not responsible for the *wrongs* of its officers or employés, committed in the performance of a public, as distinguished from strict corporate duty.

"The exemption from liability in these and like cases is upon the ground that the *service is performed by the corporation* in obedience to an act of the Legislature; is one in which the corporation as such has no particular interest and from which it derives no special benefit in its corporate capacity; that the members of the fire department, *although appointed, employed and paid by the city corporation*, are not agents and servants of the city *for whose* conduct it is liable; *but they act rather as officers of the city* charged with a public service for whose *negligence* in the discharge of official duty no action lies against the city without being expressly given."   (Dillon's Municipal Corporations, § 976, 4th ed.)

In other words, it is the duty of the defendant to appoint or employ clerks, policemen, firemen and teachers; it is the duty of the defendant to pay them, and they are officers of the city, but because these officers are engaged in the performance of public services, the courts have held, as a matter of public policy, that the city is not liable for their torts.

There is no holding that they are not the agents and servants of the city for the purpose of binding the city by their *contracts* within the scope of their authority.

On the contrary, in Swift v. The Mayor (83 N. Y., 534), where the police department of New York made a contract for the removal of garbage from the streets, and that city sought to evade responsibility for reasons similar to those stated above by Judge Dillon, our Court of Appeals held that "the right to maintain actions upon demands against the corporation is expressly recognized, and although in the case of street cleaning the power of incurring obligations is conferred upon the police department, yet the department *exercises the power simply as one of the executive branches and instrumentalities of the*

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 34 of 50

*city government,* created for the purpose of performing a duty of the corporation, and the obligations are incurred in its behalf, and the duty not only of providing means for their payment, but also of paying them out of its treasury through its financial department, rested upon the corporation."

And in Bell v. The Mayor, etc. (105 N. Y., 139), in action to foreclose a mechanic's lien on a school-house, where the city defended on the ground that the contract was with the board of education and not with the city, the court held that the cases of Maximilian, Ham, Smith, etc., *supra,* had no application, as they were actions for torts, whereas the Bell case was on contract, and also that the board of education was a department of the city government, *and acted in fact and in substance for the city in regard to a public work.*

So in this case of The People v. Buffalo, the mayor, the superintendent of education, the park commissioners, the fire commissioners and the police commissioners employed, for and in behalf of the corporation, the employés above named to perform a public duty. And these persons are no less employés of the city because their duties are of a public nature. In fact every duty performed by the corporation is a public duty. The city employs and the city pays these men, and for proper cause the mayor may suspend or remove them from office. (Charter, title II, § 24.)

VI. The defendant contends that inasmuch as these employés are employed at a yearly salary, their salaries are not by the terms of their employment payable otherwise than yearly, and that therefore no wages are *earned* until the end of each year. The very object of the statute was to prevent yearly or monthly payments, and to require payments to be made weekly. The construction contended for would defeat this object, not only as affecting municipal corporations, but all the other corporations mentioned in the act; for those bodies need but make monthly or yearly contracts of hiring, and then say that this act does not apply, because no wages are *earned* until the end of the month or the year, as the case may be.

The obvious meaning of the word "earned," in this statute, is the amount of wages which the employé merits or deserves — the *quantum meruit* — to within six days of the date of payment.

"It is the spirit and purpose of the statute which are to be regarded in its interpretation, and if these find fair expression in the statute, it should be so construed as to carry out the legislative intent, even though such construction is contrary to the literal meaning of some provision." (People v. Lacombe, 99 N. Y., 49.)

17

130     FIFTH ANNUAL REPORT OF THE

Where a statute is susceptible of two constructions, both equally reasonable, one of which will render it valid, the other void, the courts will adopt the former. (People ex rel. v. Terry, 108 N. Y., 1.)

VII. Finally, the objection is made that the Weekly Pay act is a general law and that it does not repeal by implication or expressly the provisions of the charter of Buffalo, or the local laws affecting that city; and that inasmuch as the ordinances provide for yearly salaries (except to the police), and by custom these salaries are paid monthly, therefore the Weekly Pay act does not affect Buffalo at all.

The answer to this is that the act affects every municipal corporation in the State, and in effect repeals all local laws in conflict with it.

"Every * * * municipal corporation * * * *shall* pay weekly each and every employé engaged in its business." (Chapter 388, Laws 1890.)

There is no exception in favor of any city or any employé. The statute is mandatory and sweeps away all repugnant acts.

It is a principle of very extensive operation that affirmative statutes of a general nature do not repeal by implication charters and acts passed for the benefit of particular municipalities; *but they do so when this clearly appears to have been the purpose of the Legislature.* If both the general and special acts can stand, they will be construed accordingly. If one *must* give way, it will depend upon the supposed intention of the lawmaker, to be collected from the entire legislation, whether the charter is superseded by the general statute, or whether the special charter provisions apply to the municipality, in exclusion of the general enactments. (Dillon's Municipal Corporations, § 87, 4th ed.)

The clear purpose of the Legislature, as expressed in this Weekly Pay law, is that every employé of every municipal corporation shall be paid weekly.

In the case of The Buffalo Cemetery Association v. Buffalo (118 N. Y., 62; 43 Hun, 127) the act considered was general in its terms and there was nothing in it manifesting an intention to repeal or alter the prior statute, which provided specially for the case of plaintiff. Besides, the two statutes *were not inconsistent.* (See opinion of Judge Smith, 47 Hun, 130.)

In People v. Jaehne (103 N. Y., 194) the rule is laid down by Judge Andrews as follows: "Whether a subsequent statute repeals a prior one, in the absence of express words, depends upon the intention of the Legislature, and one of the tests frequently resorted to to ascertain whether there is a repeal by implication is to inquire *whether the special and general acts may both be executed* without involving repugnancy of

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 36 of 50
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020

rights or remedies.   *   *   *   It will be found on examining the cases in which the courts have held that a special law was not repealed by a subsequent general law on the same subject, that they are as a general rule cases where the Legislature was not dealing directly with the subject of the prior law, and it was not in the mind of the Legislature when the general law was enacted."

In the case at bar there is such a repugnancy between weekly and monthly or yearly payment of wages that both the general and special act or ordinance can not prevail, and as the Legislature intended to compel payments to be made weekly, the local law or custom must give way.   (See People v. O'Neil, 109 N. Y., 251.)

See, also, People ex rel. v. Daley (37 Hun, 461), where it was held that the general law providing for a uniform system for the organization of boards of health repealed the special provisions on that subject contained in the charter of the village of Edgewater.

For the foregoing reasons it follows that judgment should be given in favor of the people for the full amount claimed.

CHARLES F. TABOR,
*Attorney-General.*

JOHN T. McDONOUGH,
*of Counsel, Albany, N. Y.*

## BRIEF OF F. C. LAUGHLIN, ESQ.

POINTS FOR DEFENDANT.—This is a case submitted under section 1279 of the Code of Civil Procedure, and involves the construction of the provisions of Chapter 388 of the Laws of 1890, known as the Weekly Payment law, in connection with the charter and ordinances of Buffalo.

For the purpose of getting a judicial interpretation of this law, as broad as possible, a question is presented as to its application to the mayor's department, to the park department, to the school department, to the fire department, and to the police department.

On the part of the plaintiff it is contended that the members of each of the departments above mentioned, are employés of the city, within the meaning of said act, and that their salaries are wages within the meaning thereof, and are earned at the end of each week; while the defendant claims directly the opposite, and that said law is not applicable to the offices in question.

It is conceded that an annual salary is attached to each of those offices, and that prior to July first, this year, it had been the custom to pay such salaries in monthly installments, and that payment at such times was voluntary, not being required by any contract, law or ordinance.

132          Fifth Annual Report of the

Point I. The persons mentioned in the submitted case, to wit: The license clerk in the mayor's department, the secretary and treasurer of the park department, one of the teachers in the public schools, a fireman and a policeman, are not employés of the defendant whose salaries are wages earned within the meaning of said act.

(a.) The title of the act is as follows: "*An act to provide for the weekly payment of wages by corporations.*"

The body of the act, so far as it is necessary to be considered here, is as follows;

"Section 1. Every manufacturing, mining or quarrying, lumbering, mercantile, railroad, surface, street, electric and elevated railway (except steam surface railroads), steamboat, telegraph, telephone and municipal corporation, and every incorporated express company and water company, shall pay weekly, each and every employé engaged in its business, the wages earned by such employé to within six days of the date of such payment, provided, however, if at any time of payment any employé shall be absent from his regular place of labor, he shall be entitled to said payment at any time thereafter upon demand.

"§ 2. Any corporation violating any of the provisions of this act shall be liable to a penalty not exceeding fifty dollars and not less than ten dollars for each violation, to be paid to the people of the State, and which may be recovered in a civil action; provided an action for such violation is commenced within thirty days from the date thereof. The factory inspectors of this State, their assistants or deputies, may bring an action in the name of the people of the State as plaintiff against any corporation which neglects to comply with the provisions of this act for a period of two weeks, after having been notified in writing by such inspectors, assistants or deputies that such action will be brought. On the trial of such action, such corporation shall not be allowed to set up any defense for a failure to pay weekly any employé engaged in its business the wages earned by such employé to within six days of the date of such payment, other than a valid assignment of such wages or a valid set-off against the same, or the absence of such employé from his regular place of labor at the time of payment, or an actual tender to such employé at the time of payment of the wages so earned by him, or a breach of contract by such employé, or a denial of the employment. No assignment of future wages, payable weekly under the provisions of this act shall be valid if made to the corporation from whom such wages are to become due, or to any person on behalf of such corporation, or if made or procured to be made to any person for the purpose of relieving such corporation from the obligation to pay weekly under the provisions of this act. Nor shall any of said corporations require any

agreement from any employé to accept wages at other periods than as provided in section 1 of this act, as a condition of employment."

It will be observed that neither the word "*officer*" nor "*salary*" is used in the act; and that the only words indicating the persons to whom, and the compensation to which it refers are "*employé*," "*wages*", and "*regular place of labor.*"   It will be observed that the "*wages*" required to be paid are "*wages earned by such employé to within six days of the date of such payment.*"

(*b*) The license clerk is classed in the charter in the title on officers, and is "*appointed*" by the mayor. (§ 24, tit. II, chap. 519, Laws of 1870, being charter of Buffalo.)  And the *salary* of the office is *fixed by the common council* by ordinance.  (§ 4, tit. III of charter, and see p. 101 of city ordinances.)

The secretary and treasurer of the park commissioners is "*appointed*" by them under authority "*to appoint such engineers, surveyors, clerks and other officers as may be necessary, and his salary is fixed by them.*" (§ 23. tit. IX of charter.)

The teachers to be employed in the different schools are "*selected*" by the superintendent of education and "*hired*" by him *for one year at an annual salary fixed by the common council.*   (§ 11 tit. XI of charter, and see city ordinances, § 1 of chap. IX, pp. 101 and 102, and § 37, chap. VI of city ordinances, p. 90.)

The firemen are "*appointed*" by the board of fire commissioners and *their salaries are fixed by the common council* by ordinance at so much *per annum.*  (Chap. 250, L. 1886.)

The patrolmen are "*appointed*" by the board of police commissioners, under a special act, *and are referred to as officers, and their salaries are fixed by the act itself.*  (§§ 2, 8, 17, 20 and 36 of chap. 436, L. of 1880.)

(*c.*) All of these, with the possible exception of the teachers, are public officers. (Rogers v. City of Buffalo, 2 N. Y., *supra*, 326; and 3 N. Y., *supra*, 671; Costello v. Mayor, etc., 63 N. Y., 48.)

This is true of the charters of other cities, as well as Buffalo; and the Legislature in framing and enacting the law in question is presumed to be familiar with the general terms used in previous legislation to designate the persons holding positions under city governments, and to designate the compensation attached to such positions. (See Magnus v. Brooklyn, 98 N. Y., 585.)

(*d.*) Webster defines the word "*wages*" as " *a compensation given to a hired person for his or her services.*"

Bouvier, in his Law Dictionary, defines it the same.   The definition of "wages," as given in Abbott's Law Dictionary, is "*the agreed com-*

134          FIFTH ANNUAL REPORT OF THE

pensation for services rendered in a menial or subordinate capacity," and the word "salary" as "a reward or compensation for services performed. It is usually applied to the reward paid to a public servant for the performance of his official duties."

Burrell, in his Law Dictionary, defines the word "salary" as "an annual compensation for services rendered; a fixed sum to be paid by the year for services."

There is also high modern judicial authority for a distinction between the words "wages" and "salary" as those terms are generally used.

In the case of Gordon v. Jennings, (L. R., 9 Q. B. D., 45) the court says: "The term wages is not applied to the remuneration of a high or important officer of the State or of a company, for instance, but to that of domestic servants, laborers and persons of similar description."

In Cowdin v. Huff (10 Ind., 85) the court says: "Wages are the compensation paid, or to be paid for services by the day, week, etc., as of laborers, commissioners, etc. Salaries are the per annum compensation paid to men in official and some other situations. The word 'salary' is derived from salarium, which is from the word sal, salt, being an article in which the Roman soldiers (public officers) were paid."

In McLellan v. Young (54 Ga., 400) the court says: "The salary of a public officer is in no fair sense of the word wages."

The case of South & N. A. R'd Co. v. Falkner (49 Ala., 115) recognizes the same distinction.

In the case of People ex rel. Satterlee v. Board of Police (75 N. Y., 38) it was held that a police surgeon was not a "clerk or employé," but an "officer," and the court uses the following language: "Employés are usually considered as embracing laborers and servants and those occupying inferior positions."

In the case of Wakefield v. Fargo et al (90 N. Y., 217), and cases cited, it was held that the words "laborers, servants and apprentices," did not include officers, or general agents, and bookkeepers. (See, also, Hill v. Spencer, 61 N. Y., 274; People v. Remington, 45 Hun, 333.)

(e.) These are not mere technical distinctions, but are substantial and well founded in law. In the ordinary case of employer or employé, of master and servant, there is a contract of hiring, and the right to compensation depends on there being a contract and agreement between the parties therefor; but in the case of public officials there is no contract or hiring; they are elected or appointed to an office to which the law has attached a salary, and they are entitled to that salary so long as they hold the office as an incident, and not by virtue of any contract, for, except in a few instances specified in the Constitution, the Legislature may abolish the office before the term expires or reduce the salary at will. (Fitzsimmons v.

FACTORY INSPECTORS.                          135

City of Brooklyn, 102 N. Y., 536; People ex rel. Ryan v. French et al., 91 N. Y., 265; Long v. Mayor, 81 N. Y., 425; McVeany v. Mayor, 80 N. Y., 190.)

(*f.*) The employer or master is liable for the acts of his employés or servants in the line of their employment; but this relationship does not exist between the city and the members of the police, fire and health departments, and it is not liable for the acts of its policemen, or its firemen or members of its board of health, even in the line of their duty. The law treats them as public officers engaged in protecting life and property, and not as agents, servants or employés. (Dillon on Mun. Corp., 4th ed., §§ 10, 210, 975 and 976; Wood on Master and Servant, §§ 663 and 664 ; McKay v. City of Buffalo, 9 Hun., 401; Aff. 74 N. Y., 619; Maxmilian v. Mayor, 62 N. Y., 160; Bamber v. City of Rochester, 26 Hun., 587; Haight v. Mayor, 24 Fed. Rep., 93; Terhune v. Mayor, 88 N. Y., 248–251; Smith v. City of Rochester, 76 N. Y., 506; Thompson v. Mayor, etc., 52 N. Y. Supr. Ct., 427.)

(*g.*) If an officer of a city is wrongfully discharged from office, he may, without having performed any service in the office, recover his full salary from the city without any deduction for what he may have earned in other business while out of office; but in the case of master and servant, and employer and employé, if the servant or employé is wrongfully discharged, he must seek other employment and can only recover the difference between what he would have received had he not been discharged and what he has otherwise earned. (Fitzsimmons v. City of Brooklyn, 102 N. Y., 536.)

(*h.*) An employé can only recover for his services, that is for the time he works; but an official, with an annual salary fixed by law is entitled to his salary during the time he is permitted to hold office, even though he may be unable to perform the duties of the office through sickness or other disability. (People ex rel. Ryan v. French, N. Y., 276–279; O'Leary v. Board of Education, 91 N. Y., 1.)

(*i.*) Our municipal salaries are expressly fixed in the charter or special acts of the Legislature, or by the ordinances enacted by the common council pursuant to the express provisions of the charter.

There being no contract of hiring, the officer making an appointment has nothing to do with the amount of salary or the time or terms of payment. The salaries being fixed at so much per annum, are not earned until the end of the year and could not be recovered until that time. (McVeaney v. Mayor, 80 N. Y., 190; Connor v. City of N. Y., 5 N. Y., 285; Long v. Mayor, 81 N. Y., 425; Nichols v. MacLean, 101 N. Y., 526; Wood on Master and Servant, §§ 84 and 104.)

136          FIFTH ANNUAL REPORT OF THE

(*j.*) An employé may legally assign his future wages; but public policy renders such an assignment by a public official void. (Bliss v. Lawrence, 58 N. Y., 442.)

(*k.*) Another reason why we think this law was not intended to apply to the salaries of public officials is that in the second last sentence of section 2 thereof it is assumed that the wages to which it refers are legally assignable before being earned, which, as we have seen, is not the case with the salary of a public official, and the Legislature presumably knew of this rule of law.

(*l.*) The Weekly Payment law contains no repealing clause, and the charter and police act are special local laws, the provisions of which are not repealed or superseded thereby, and the special law now expressly provides how the salaries of the members of the police department shall be paid, and that they shall be paid once each month. (§ 36, chap. 436, Laws 1880; Buffalo Cemetery Association v. City of Buffalo, 118 N. Y., 61.)

(*m.*) Although the teachers are not public officers, they are legally hired by the year under our charter and ordinances, and at a fixed annual salary, and their compensation for their services is not earned and could not be legally collected, under the authority above cited, until the end of the year.

(*n.*) It is quite clear that the object and intent of this act was to remedy the abuse practiced by corporations on their day laborers, in unreasonably neglecting to pay them their daily wages, upon which they are dependent for the support of themselves and families. The title and language of the act bear out this construction. The command of the statute is to pay "*the wages earned by such employés to within six days of the date of such payment.*" *This shows that the law was intended to compel the payment of wages which have been earned and due for six days, and not to declare salaries due before they are earned or would be due under the general rule of law.*

(*o.*) High-salaried officials, with permanent employment for specific terms, or as most of them are, under the civil service law, during good behavior, and removable only upon charges and after a hearing, did not need legislation in their behalf with respect to the time their salaries should be paid.

II. Judgment should be directed entered in favor of the defendant for costs, in accordance with the terms of the submitted case.

W. F. WORTHINGTON,
*Corporation Counsel for Defendant.*

FRANK C. LAUGHLIN,
*Of Counsel.*

FACTORY INSPECTORS. **137**

OPINION OF THE COURT.

Upon the foregoing submitted facts and arguments the General Term rendered the following decision:

SUPREME COURT:

GENERAL TERM, FIFTH DEPARTMENT, }
*October*, 1890.

Present.— CHARLES C. DWIGHT, P. J.; FRANCIS A. MACOMBER, THOMAS CORLETT, J. J.

HEARING UPON A CASE AGREED UPON IN PURSUANCE OF THE PROVISIONS OF SECTION 1279 OF THE CODE OF CIVIL PROCEDURE.

Appearances.— Mr. JOHN T. McDONOUGH, *for the plaintiffs*; Mr. FRANK C. LAUGHLIN, *for the defendant*.

MACOMBER, J.— The submission to this court, made in pursuance of the provisions of the Code of Civil Procedure, is for the purpose of obtaining a judicial construction and application of Chapter 388 of the Laws of 1890, entitled "An act to provide weekly payments of wages by corporations." By the terms of the agreement of submission, if the plaintiffs prevail, there should be a recovery of five penalties of ten dollars each against the defendant by reason of the failure and neglect of the city of Buffalo to pay weekly the compensation earned between September 1st and the 23d, 1890, by John G. Goshleski, a clerk in the mayor's office; by George H. Selkirk, secretary and treasurer of the park commissioners; by John H. Brewster, a member of the fire department of the city of Buffalo; by George H. Stowitts, a school teacher; and by Michael Collins, a patrolman on the police force.

So much of section 1 of the act in question as is material to this hearing is as follows:

"Every manufacturing, mining or quarrying, lumbering, mercantile railroad, surface, street, electric and elevated railway (except steam surface railroads), steamboat, telegraph, telephone and municipal corporation, and every incorporated express company and water company, shall pay weekly, each and every employé engaged in its business, the wages earned by such employé, to within six days of the date of such payment."

The people claim that each and every one of the five persons above mentioned was and is an employé of the municipal corporation, known as the city of Buffalo, whose salaries were wages earned, and that each of them was and is entitled to be paid his wages weekly, in pursuance of the provisions of said act.

138          FIFTH ANNUAL REPORT OF THE

On the other hand, the city of Buffalo claims that each of said persons was not and is not an employé of said city within the meaning of the statute; that the salary of each of such persons was not wages within its meaning, and, generally, that the Weekly Payment law is not applicable to persons occupying such places.

The principle which is to control us in the interpretation or construction of this law, is the intention of the Legislature in passing the same, to be ascertained from the language of the act and also from the cause or necessity of making the statute.

A strict and literal interpretation is not always to be adhered to, where the cause is brought within the intention of the makers of the statute, although, by a technical interpretation, it is within its letter. It is the spirit and the purpose of the statute which are to be regarded by us. The laws should be so construed as to carry out the legislative intent, even though such construction be contrary to the literal meaning of some of the words used therein. (People v. Lacombe, 99 N. Y., 49.)

Not much need be said in regard to the word "wages," used in the title and body of the act, for if the statute had not used the word "employé," thus connecting the word "wages" with a person, in many instances, above the grade of a laborer, the people of this State, through its Factory Inspector, would probably not have sought a decision of the court upon these questions.

There is no doubt that the word "employé" is often used in a sense much in enlargement of the words "servant," "workman," or "laborer." The only attempted legislative definition of the word which I have been able to find, is contained in the report of the Commissioners of the Code in submitting to the Legislature an act entitled "The Civil Code," in the year 1865, but which never has been enacted into a statute. The commissioners there made the following definition (§ 1004): "The contract of employment is a contract by which one who is called the employer, engages another, who is called the employé, to do something for the benefit of the employer or of a third person." The commissioners in a note say that the scope of the whole chapter, beginning with the above-quoted provision, is not intended to be confined to servants, but includes factors, brokers, carriers, agents and all similar classes of persons. Among lexicographers, the definition given by Professor Whitney, in the Century Dictionary, of the word "employé" seems to be the most lucid and comprehensive. It is as follows:

"One who works for an employer; a person working for a salary or wages; applied to any one working, but usually only to clerks, work-

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 25
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 44 of 50
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020

men, laborers, etc., and but rarely to the higher officers of a corporation or government, or to domestic servants; as, the employés of a railroad company."

That the word may have different meanings in different connections admits of no doubt. The principal enunciated by Horne Took, in his "Diversions of Purley," that a word has "one meaning and only one," has no application in cases arising in statutes where construction or interpretation is required, except, perhaps, in scientific matters. Worcester, in the prefix of his dictionary, says: "Though there may be found in Johnson's dictionary many instances in which a distinction is made where there is little or no difference, yet the principle stated by Horne Took that a word has 'one meaning and only one,' can not be admitted without numerous exceptions. Take, for example, some very common words, the nouns *law, letter, line, post;* though the different sense in which these words are used may be, in some measure, in accordance with one original meaning of each, yet a single definition of each of the words would afford but very inadequate explanation. The original or etymological meaning of many words has become obsolete, and they have assumed a new or modern meaning; many which retain their etymological meaning have many other meanings annexed to them; many have both a literal and metaphysical meaning, and many both a common and technical meaning, all of which need explanation.

The primary general sense of a word often ramifies into different senses, as Webster illustrates in the preface to his dictionary. He says, in substance, that by attention to the different uses and applications of the word, we become able, in most cases, to arrive at a satisfactory explanation of the manner in which the same word comes to be used with different significations.

Professor Whitney says that: "Both historically, and with regard to present usage, it is impossible to draw a hard and fast line between the two sides of words used in our language, either with respect to the words or to their individual senses."

It may be broadly stated, therefore, that the word "employe," as used in the body of this statute, standing by itself without words of limitation, is sufficient to include, not only persons engaged in natural labor, such as servants and laborers, but also such as may be employed otherwise. As was well held in the case of Gurney v. Atlantic and G. W. Ry. Co. (58 N. Y., 358), where, under an order and judgment of this court requiring the receiver to pay the laborers and employés of the company for labor and services actually done in connection with that company's railway, the compensation of Jeremiah S. Black, a lawyer, was

held to be payable by the assignee. In that case Chief Judge Church says: "It is quite as rational to believe that the intent was to include as to exclude the debt of the claimant. Debts for materials and supplies were protected, and why may we not suppose that the claimant's demand was regarded to be as just and equitable as those, especially under the circumstances referred to? The mortgage creditors received what they regarded a great benefit by making these concessions in the immediate appointment of the receiver, and the order should be literally construed in favor of creditors who are presumed to have assented to them and relied upon them for the payment of their debts."

Judge Allen in the same case says: "In the absence of any intent apparent on the face of the order to discriminate between different classes of employés or different kinds of service, the court can not confine it to a single class or to a particular service. The term employé is the co-relative of employer and neither term has, either technically or in general use, a restricted meaning by which any particular employment or service is indicated. The terms are as applicable to an attorney and client, physician and patient, as to master and servant, a farmer and day laborer, or a master mechanic and his workman." But conceding so much to the extent of the meaning of the word "employé," it brings us only to the real question in issue. That word must be read in connection with the word "wages" contained in the body as well as in the title of the act. The word "wages" here used limits the meaning of the word "employé."

In the case already cited from the Court of Appeals, no one, while conceding the correctness of the allowances to Mr. Black, would say that such allowances were wages. The statute therefore, contains within itself a limitation upon the meaning of the word "employé." The case, consequently, as presented to us, is not whether the salary of an employé or the compensation of an employé, but whether the *wages* of an employè shall be paid weekly or not.

But whatever meaning may be lexically imputed to the word "employé," and whatever differences of meaning may arise when the word is used in different relations and connections, the safe mode of interpreting the word, as used in this statute, is to take into account the cause for the passage of the act, so far as it may be ascertained, and the evil sought by the act to be remedied.

This statute belongs to a large class of legislation designed for the promotion and the welfare of laborers and workmen, and may be classed with the Act of Parliament of 38 and 39 Vic., chap. 90, entitled "Employer's and Workmen's act," and other like statutes,

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 23
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 46 of 50
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020

and the acts of our own legislature, for the limitation upon the
employment of children of tender age, the limitation of the hours of
labor, the protection of laborers under the acts for the inspection of
factories and acts like Chapter 380 of the Laws of 1889, "To regulate
the rate of wages on public works and to define what laborers shall
be employed thereon." In the construction of an act passed for such
a purpose we are not to adopt the rule of a strict construction, as is
done in the case of penal statutes and laws in derogation of the com-
mon law, although it is apparent that in our aspect of this statute it
does interfere with the right of the employer to make a bargain
with his employé in respect to the time of payment for his services.
Nor should the statute be loosely, which is generally called liberally,
construed; it should receive that interpretation which the court
gave to the act involved in the case of Chamberlain v. Western Trans-
portation Co. (44 N. Y., 305), that is to say, fairly to carry out the policy
which the statute was enacted to promote. If the words used are
not explicit, their meaning must be gathered from the occasion and
necessity of the law. In so construing the statute, the reason or
motive upon which the Legislature proceeded and the design sought
to be accomplished must be held in mind. The statute must be con-
strued in accordance with the natural and obvious import of the
the language there used, and not by resort to subtle and forced con-
struction for the purpose either of limiting or extending its opera-
tions. (Chamberlain v. Western Transportation Co., *supra*, and Waller
v. Harris, 20 Wend., 555–561.) As was said by Judge Jewett, in
Tonnels v. Hall (4 N. Y., 144): "Whenever the intention can be dis-
covered it ought to be followed with reason and discretion in its
construction, although such construction may seem contrary to its
letter."

Notwithstanding the comprehensive meaning which has been above
accorded to the word "employé," for the purposes of the construction
of this statute, yet the statute may be qualified and restricted by
reference to other parts of it and the circumstances and facts exist-
ing at the time and to which they relate. As Judge Allen says, in
the case of Smith v. People (47 N. Y., 337): "A literal interpretation
of words in the most common use, and having a well-defined meaning
as ordinarily used, would not unfrequently defeat rather than
accomplish the intent of the party using them. If, in reading a
statute in connection with other statutes passed at or about the same
time, a doubt exists as to the force and effect the Legislature intended
to give to particular terms, that is, as to the meaning which it was
intended they should bear and have in the connection in which they

Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 47 of 50

are used; it is also competent to refer to the circumstances under which and the purposes for which a statute is passed, to ascertain the intent of the Legislature. The ground and cause of the making of a statute explains the intent."

Under these rules of construction and interpretation, it is obvious that this act was intended by the Legislature to take its place among others for the protection of laborers and workmen.

There is no special reason observable, either from the act itself or from the preceding legislation leading up to it, why the license clerk in the mayor's department in the city of Buffalo, or the secretary and treasurer of the park commissioners of that city, or a public school teacher, or a fireman, or a patrolman, should be paid otherwise than in accordance with the terms of his agreement with his respective employers. Not one of these persons represents a class asking for legislation in its behalf. It would, therefore, be extending the statute beyond what appears to us to be the obvious meaning of the Legislature in passing it to apply it so as to cover the cases of these persons.

Very little, if any, aid may be afforded in the construction of this statute in order to show its meaning and application, by reference to other statutes pertaining to laborers, except others of its own class as stated above. There is, however, a series of cases having a bearing upon the subject-matter here involved, arising under chapter 40 of the Laws of 1848, making stockholders of corporations liable to "laborers, servants and apprentices" of the corporation, and holding that such law cannot be intended by the courts to include clerks and contractors and other persons. Reference may be made to Krauser v. Ruckel (14 Hun, 463); Coffin v. Reynolds (37 N. Y., 640); Hill v. Spencer (61 N. Y., 274), and Wakefield v. Fargo (90 N. Y., 213). For discussions of the principle that an act manifestly designed for the protection of servants, laborers and apprentices, cannot be properly extended by construction to other persons, although the word "servant" or "laborer" detached from the connection in which it is used in the statute, and used metaphysically, is broad enough to include any person who engages his services to another for compensation.

It follows, therefore, that judgment must be ordered for the defendant upon the submission.

DWIGHT, P. J., and CORLETT, J.

It will be seen that in deciding the questions at issue the learned judge practically concedes that the words " wages " and " salary," as used in this act, are synonymous, and

FILED: QUEENS COUNTY CLERK 09/08/2020 12:08 PM
NYSCEF DOC. NO. 25
INDEX NO. 720074/2019
RECEIVED NYSCEF: 09/08/2020
Case 1:23-cv-04541-DEH-JLC   Document 63-2   Filed 06/24/24   Page 48 of 50

that the word "employé" in itself embraces such persons as minor city officials; but renders an adverse opinion upon the ground that the Legislature did not intend the law to affect such employés. It has been decided after consultation between Mr. McDonough, the Attorney-General, and the Factory Inspector, not to appeal the case, believing that if the Legislature really intended that the law should apply to minor city employés, an amendment to that effect would be passed before a decision could be obtained from the Court of Appeals upon the question.

## ATTORNEY-GENERAL'S OPINION.

In order to obtain a legal definition of the meaning of the Weekly Payment act in certain cases wherein the law did not seem clear, the following communication was addressed to the Attorney-General:

OFFICE OF FACTORY INSPECTOR, }
ALBANY, *July* 17, 1890.          }

Hon. CHARLES F. TABOR, *Attorney-General:*

DEAR SIR.— The Factory Inspectors are charged with the duty of enforcing Chapter 388 of the Laws of 1890, entitled "An act to provide for the weekly payment of wages by corporations." Will you kindly give your opinion on the following questions which have been raised regarding the scope of the said act :

1. Where a corporation has been organized to engage in the manufacture of any article, and sublets its plant and premises to an individual as agent to carry on the business under contract, such individual paying the corporation according to the amount of material manufactured, or a percentage of the profits, is such contracting individual required to pay his employés weekly, for such labor as they perform while operating the plant of the corporation?

2. Does the clause requiring that employés of corporations shall be paid weekly to within six days of the date of payment, mean six calendar days, or six working days, that is, excluding Sunday, which is not a legal work day?

3. Does the act, in exempting steam surface railroads, exempt car-building establishments operated as an adjunct of such railways, when such car-building establishments and the plants therein are owned by distinct corporations, under charters not empowering them

to operate railways, and the railways operating such shops paying percentages to the corporation owning the establishments — or, in other words, can a manufacturing corporation merge itself into a steam surface railway corporation and thus escape the provisions of the act?

4. Are joint-stock companies or associations included in this act by the term "corporations" as understood by the laws of this State?

Respectfully submitted,

(Signed.)                 JAMES CONNOLLY,
                                    *Factory Inspector.*

### THE QUESTIONS ANSWERED.

ATTORNEY-GENERAL'S OFFICE,   }
ALBANY, *July* 23, 1890.        }

Hon. JAMES CONNOLLY, *Factory Inspector :*

DEAR SIR.— I am in receipt of a communication from you in which you ask me for my opinion on the following questions arising under chapter 388 of the Laws of 1890, entitled "An act to provide for the weekly payment of wages by corporations":

In answer thereto, I beg leave to say:

*First question.*— The answer to this question, in my judgment, depends upon the legal relation that may be said to exist between the *corporation* named and the *individual* carrying on a portion of its business under the circumstances stated by you, the "corporation" being covered by the law, and the individual not. The courts have held that where a *corporation* sublets a portion of its premises to an individual, who employs other parties to do the work thereon, that as between such parties and the *corporation* no legal relation exists. Especially is this so where such parties are not employed, paid or discharged by the *corporation.* In such a case the corporation is not responsible for their acts or their negligence. In other words, there is, as to them, no privity or contract, and the relation of master and servant does not exist between them. (King v. N. Y. C. R. R. Co., 66 N. Y., 181; Hexamer v. Webb, 101 N. Y., 377.)

As between the corporation and the party contracting, the relation is one of contract only. (Aiken v. Washburn, 24 N. Y., 482; Balch v. N. Y. C., etc., R. R., 46 N. Y., 521.)

Therefore, if the arrangement indicated by you was actually made, and in good faith, I do not think the "individual" referred to would be subject to the provisions of the Weekly Payment act.

*Second question.*— I am not quite certain what the Legislature meant by the words " to within six days of the date of such payment,"

FACTORY INSPECTORS. **145**

but I am inclined to think that they should be controlled by or construed in connection with the words preceding, viz., "shall pay weekly ;" and, therefore, a payment upon the corresponding day of every week will be a sufficient compliance with the act. If the words do not mean this, then I am unable to say what they do mean. Any other construction than that indicated would, it seems to me, require a change in every following "pay day."

*Third question.*— If I understand the facts referred to in this question, the answer already given to the first question is decisive of this one. I think from your statement that there is no such relation existing between the "car-building establishment" and the steam surface railroad company referred to, as will absolve the first-named corporation from the provisions of the Weekly Payment act. In other words, it is still a manufacturing corporation carrying on its business, and liable to all provisions of law applicable thereto as such.

*Fourth question.*— Joint-stock companies or associations, excepting incorporated express companies, are not, in my opinion, included in the act, Chapter 388, for the reason that corporations generally are not mentioned, but only specified corporations are enumerated, together with "incorporated express companies ;" and the general term "corporations" not being used, joint-stock companies would not be included in said act.

Respectfully yours

(Signed.)　　　　**CHARLES F. TABOR,**

*Attorney-General.*

## PROSECUTIONS.

The following prosecutions were instituted during the past year :

### CASE OF GEORGE MUGRIDGE & SON, BUFFALO.

*January* 2, 1890.— The firm of George Mugridge & Son, bakers, of Nos. 10 to 14 Elk street, Buffalo, were charged by Assistant Inspector Franey with not having complied with section 8 of the Factory law, in not attaching automatic doors to the elevator in their establishment. When arraigned in the police court they asked that further time be granted to permit them to comply. This was given and the elevator was thereupon guarded according to law and the charge withdrawn.

19